# COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges AtLee, Athey and Callins


COMMONWEALTH OF VIRGINIA, ET AL.

MEMORANDUM OPINION[*] BY
v.      Record No. 0021-24-2            JUDGE CLIFFORD L. ATHEY, JR.
NOVEMBER 5, 2025

JONES LANG LASALLE AMERICAS, INC., ET AL.


UPON A REHEARING


FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Clarence N. Jenkins Jr., Judge

(Jason S. Miyares, Attorney General; Leslie A.T. Haley, Deputy
Attorney General; Chandra D. Lantz, Senior Assistant Attorney
General/Section Chief; Curtis G. Manchester, Senior Assistant
Attorney General; Mathew A. Taylor, Senior Assistant Attorney
General; Emma C. Greger, Assistant Attorney General, on briefs),
for appellants.

(Edward V. Arnold; Steven J. Kmieciak; Seyfarth Shaw LLP, on
brief), for appellees.


This matter involves a complex legal dispute relating to a contract for excavation work

wherein a water main pipe located in an underground utility tunnel was breached thereby

resulting in the flooding of Sanger Hall, a building owned by the Commonwealth of Virginia and

located on the Medical College of Virginia ("MCV") campus of Virginia Commonwealth

University ("VCU"). On December 6, 2023, the Circuit Court for the City of Richmond ("circuit

court") sustained joint demurrers filed by a group of contractors and sub-contractors who

performed work pursuant to the excavation contract including Jones Lang LaSalle Americas, Inc.

("Jones Lang LaSalle"), Draper Aden Associates, Inc. ("Draper Aden"), Skanska USA Building

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

Inc. ("Skanska USA"), Bradshaw Construction Corporation ("Bradshaw Construction"), RMF Engineering, Inc., P.C. ("RMF Engineering"), Randolph P. Rivinus, P.E. ("Rivinus"), and Kenton James Balenske, P.E. ("Balenske") (collectively the "contractors"). The circuit court dismissed the amended complaint filed by the Commonwealth of Virginia and VCU[1] (collectively the "appellants") which sought to recover tort damages from the contractors as a result of the flooding of Sanger Hall.[2] The appellants assign error to the circuit court's dismissal of their amended complaint on three grounds: 1) the circuit court erred in applying the economic loss doctrine and source of duty rule after finding that the appellants failed to plead that their alleged damages were in tort and not arising from the underlying contract; 2) the circuit court erred when it found that the doctrine of judicial estoppel barred consideration of the appellants' negligence per se claims pursuant to the Underground Utility Damage Prevention Act ("UUDPA")[3] because pertinent factual allegations were changed between the filing of the original and amended complaints; and 3) the circuit court erred by determining that the contractors were "authorized" to be in the utility tunnel connected to Sanger Hall because that particular determination is a finding of fact and a legal conclusion and therefore should not have been decided by the circuit court at the demurrer stage.

---

[1] VCU is an agency of the Commonwealth of Virginia authorized by statute. Code § 23.1-2305.

[2] The Commonwealth and VCU later withdrew its appeal against contractors Draper Aden, RMF Engineering, Rivinus, and Balenske. Thus, this appeal concerns only Jones Lang LaSalle, Skanska USA, and Bradshaw Construction.

[3] The UUDPA is contained within Code §§ 56-265.14 to -265.29 and is popularly known as the "Miss Utility" Act. *Chesapeake & Potomac Tel. Co. v. Properties One*, 247 Va. 136, 139 n.1 (1994). The UUDPA "requires excavation or demolition work to be preceded by at least 48 hours' advance notification to all entities furnishing or transporting materials or services by means of underground utility lines." *Id.* (citing Code §§ 56-265.15, 56-265.17).

On July 22, 2025, this Court issued an opinion reversing the circuit court's judgment and remanding the case for further proceedings. The contractors filed a petition for rehearing. This Court granted this petition, and now reissues its opinion. For the reasons that follow, we again reverse the circuit court's judgment and remand for further proceedings.

## I. BACKGROUND[4]

### A. *The Utility Pathway Project to assist in the creation of the Children's Pavilion for the VCU Health System Authority*

This case arises out of excavation and construction services provided to assist in the design and construction of an outpatient facility to be located at VCU's MCV campus and named the Children's Pavilion Hospital ("Pavilion") (collectively the "Project"). The Project was developed by the VCU Health System Authority[5] (the "Authority"). In addition to the 14-story Pavilion, the Project also provided for a utility pathway ("Utility Pathway") to connect the Pavilion to pre-existing underground steam lines and other underground utilities which were

---

[4] Since the circuit court dismissed the Commonwealth and VCU's case on demurrer, this "recitation of the facts, of course, restates only factual allegations that, even if plausibly pleaded, are as yet wholly untested by the adversarial process." *A.H. ex rel. C.H. v. Church of God in Christ, Inc.*, 297 Va. 604, 614 (2019). Hence, in reviewing the circuit court's judgment, "we accept as true all factual allegations expressly pleaded in the complaint and interpret those allegations in the light most favorable to" the Commonwealth and VCU. *Coward v. Wellmont Health Sys.*, 295 Va. 351, 358 (2018). "Additionally, when, as here, a circuit court sustains a demurrer to an amended complaint that does not incorporate or refer to any of the allegations that were set forth in a prior complaint, 'we will consider only the allegations contained in the amended pleading to which the demurrer was sustained.'" *Lewis v. Kei*, 281 Va. 715, 719 (2011) (quoting *Yuzefovsky v. St. John's Wood Apartments*, 261 Va. 97, 102 (2001)). But, in doing so, we may "not admit 'inferences or conclusions from facts not stated.'" *Friends of the Rappahannock v. Caroline Cnty. Bd. of Supervisors*, 286 Va. 38, 44 (2013) (quoting *Arlington Yellow Cab Co. v. Transp., Inc.*, 207 Va. 313, 319 (1966)). And we may consider facts adduced by attached exhibits and a motion craving oyer. *See Hechler Chevrolet, Inc. v. General Motors Corp.*, 230 Va. 396, 398 (1985).

[5] The Authority was formerly known as the Medical College of Virginia Hospitals Authority. Despite contracting for the Project, however, the Authority is not a party to this lawsuit.

- 3 -

located within an existing utility tunnel ("Tunnel I"). Tunnel I connected the Pavilion to Sanger Hall under 11th Street.

Sanger Hall is managed by VCU, owned by the Commonwealth, and located on VCU's MCV campus. Code § 23.1-2302 (assigning VCU responsibility for property management). Sanger Hall also houses the academic, administrative, and laboratory facilities for VCU's School of Medicine. In addition, areas within Sanger Hall were explicitly leased by VCU to the Authority and the lease ceded certain rights to the Authority with respect to Sanger Hall.[6] During construction, Sanger Hall's exterior ventilation area was protected by a grated cover located between the building's outer wall and a retaining wall parallel to a neighboring street. The ventilation area also demarcated the location of subterranean cables but failed to identify the location of subterranean waterlines.

The Authority developed the Project's specifications.[7] Based upon those specifications, the Utility Pathway for the Project was to travel through the exterior ventilation area of Sanger Hall and then through a new tunnel to be constructed under 12th Street to connect to Tunnel I ("Utility Tunnel II"). The purpose for the Project's excavation work was to permit the Utility Pathway to serve the Pavilion's new outpatient facility by connecting it to existing steam lines and other utilities coming from the main VCU hospital. Sanger Hall was to be connected to the Project through its ventilation area and Utility Tunnel II. In forming the Project team, the

---

[6] The lease became part of the record through the contractors' motion craving oyer.

[7] The General Assembly has statutorily empowered the Authority to manage hospitals and medical facilities at the MCV campus. Code § 23.1-2404(A)-(B); Code § 23.1-2412. In addition, the Authority is managed by a board of twenty-one directors "made up of representatives of the Commonwealth and of VCU." Code § 23.1-2402(A). Further, the Authority has the power to "plan, design, construct . . . any project" such as "any health care, research, or educational facility or equipment necessary or convenient to or consistent with the purposes of the Authority, whether owned by the Authority." Code § 23.1-2400 (defining the term "project"); Code § 23.1-2401(B)(6); Code § 23.1-2405.

Authority separately contracted with a group of firms: Jones Lang LaSalle, Draper Aden, and Skanska USA, who subcontracted with Bradshaw Construction, RMF Engineering, Rivinus, and Balenske. Neither the Commonwealth nor VCU were parties to these contracts.

In November of 2013, with the team of general contractors and subcontractors in place, Bradshaw Construction began tunnel excavation under 12th Street, working primarily in the ventilation area of Sanger Hall among other sites under Skanska USA's supervision.

B. *The incident in question as alleged by the appellants*

On November 25, 2013, tunnel excavation work continued under 12th Street "extremely close to, if not directly under, the [City of Richmond's] existing 10" water line." Shortly after 1:00 p.m. that day, the foreman for Bradshaw Construction's crew "observed a 'trickle' of water coming into the face of the tunnel." The foreman then called the assigned project manager for Bradshaw Construction to report the apparent leak. Neither Skanska USA nor Bradshaw Construction ordered the tunneling work stopped despite the foreman's concerns. Around 1:30 p.m., Bradshaw's project manager contacted Skanska USA's project superintendent again to report that water was leaking into the tunnel. However, neither Skanska USA nor Bradshaw Construction instructed the work crew to stop tunneling. Instead, Skanska's project superintendent immediately traveled to the work site to inspect the tunnel. During his inspection, the project superintendent observed water leaking into the tunnel to the extent that water covered the boards holding the tunnel face in place. By "approximately 1:49 p.m., six minutes after the Skanska [USA] superintendent . . . arrived at [work site] and as Bradshaw continued tunnel construction, the drilling disturbed the City of Richmond's 10" water line, which broke. The full flow of the severed waterline filled the tunnel and chased the workers out of the tunnel and ventilation area." After reviewing the damage, the contractors noted that the "excavation operations caused the rupture by directly impacting the 10" water line and/or disturbing the soil

surrounding the 10" water line to such an extent that its existing support was materially compromised, causing a failure."[8] For the two hours following the water line rupture, water was observed continuing to flow out of the ruptured line. The flow of water into the tunnel was unabated until the Richmond Department of Public Utilities arrived at the work site and successfully closed the valves that permitted water to flow into the 10" line. "Due to the massive influx of water into Sanger Hall, including the building's mechanical and electrical rooms, Dominion Power Company was forced to turn off power to the entire building as well as two adjacent buildings and to evacuate the buildings." The line rupture resulted in debris and water flooding Tunnel II and the Sanger Hall exterior ventilation area. The water later entered through louvered windows into the mechanical room in the Sanger Hall B3 level basement, disrupting operations throughout Sanger Hall.[9]

C. *The ensuing litigation*

On March 4, 2021, the appellants, asserting no contractual privity, sued the contractors for 1) negligence; 2) negligence per se under the UUDPA; and 3) trespass to land, stemming from the water line rupture caused by the contractors' "design and construction" efforts. In support of these claims, the appellants alleged that the contractors "knew, or should have known," of "the existing conditions for underground utilities in an urban area such as downtown Richmond in general" as such knowledge is common for firms in the construction industry operating in the area. The appellants further contended that the contractors neglected "existing infrastructure conditions . . . and poor soil conditions" when both designing and constructing

---

[8] As understood and used by the parties, the 10" water line in question was a large-diameter pipe that allowed water to enter the properties, the Pavilion and Sanger Hall, among others in that area of Richmond, which here was located under the roadway (within the bounds of the excavation) and connected directly to the public main water distribution line.

[9] In contrast, the appellants' original complaint alleged that flooding also included the Sanger Hall ventilation shaft.

Tunnel II as a part of the Project. The appellants further alleged that the contractors knew that Tunnel II "would be built where it could disturb or damage many utility lines and facilities during construction." The appellants also contended that the flooding from the ruptured waterline caused extensive property damage to Sanger Hall requiring remediation, restoration, and repair services to the building including the replacement and decontamination of scientific equipment, furniture, and other personal property impacted by the flood. They also claimed an additional loss arising from the flood in the form of an impaired ability to conduct operations at Sanger Hall, including the lost scientific research in progress at the time of the flooding, lost funding for that scientific research, and increased costs to restart those operations. As a result, the appellants prayed for relief in the form of damages of not less than $7,642,685.

On November 18, 2021, the contractors demurred to the original complaint, asserting that the source of duty and economic loss rule doctrines barred the appellants' recovery in negligence because their alleged harms stemmed from contract. The demurrer further contended that the plaintiffs failed to plead a violation of the UUDPA because their allegations did not establish as a factual predicate that the water line breach pre-existed the tunneling excavation. Finally, they argued that the plaintiffs' trespass to land claim failed to show that the alleged trespass was as "a direct result of some act committed" by the contractors or that their actions "diverted water" into Sanger Hall. The contractors also filed an accompanying motion craving oyer along with their demurrer, seeking documents that formed the basis of the appellants' complaint.

On August 17, 2022, the circuit court held a hearing on the motion craving oyer.[10] On October 13, 2022, the circuit court subsequently granted the motion craving oyer and ordered that the appellants produce the requested documents. The appellants produced certain

_____

[10] The record does not contain a transcript for both the hearing on the motion craving oyer and on the contractors' demurrer.

documents in response to the circuit court's order including deeds relating to the Commonwealth's ownership of land at Sanger Hall, leases it may have held with VCU and the Authority, Project contracts and purchase orders, and damages calculation information. The contracts produced by the appellants were solely between the contractors and the Authority. On March 7, 2023, the circuit court held a hearing on the contractors' demurrer. After considering the parties' oral and written arguments as well as the documents produced by the motion craving oyer, the circuit court entered an order sustaining the demurrer on March 9, 2023. In the order, the circuit court found that the appellants' complaint failed to state cognizable claims on each count. The circuit court did, however, grant the appellants leave to amend their original complaint.

On April 14, 2023, the appellants filed an amended complaint, reasserting the negligence, negligence per se, and trespass to land claims. The amended complaint also 1) altered references relating to the contractual obligations between the Authority and the contractors, 2) reduced the alleged distance between the excavation work and the utility line to "within two feet," consistent with the distance that triggers conduct proscribed by the UUDPA, and 3) revised their trespass allegations to assert that the water that entered Sanger Hall passed through "louvered windows" instead of through an "eight-foot diameter hole" in the ventilation shaft where the contractors were working. On May 15, 2023, the contractors filed additional motions craving oyer, seeking documents referred to in the amended complaint. They also filed demurrers to the amended complaint contending that the amended complaint failed for the same reasons the contractors identified in their first demurrer. The contractors also filed a plea in bar asserting that the amended complaint's allegations were barred by the statute of repose.[11] On July 13, 2023, the circuit court granted the motions craving oyer and ordered the production of the relevant

---

[11] The circuit court never ruled on the plea in bar.

documents. Subsequently, on October 13, 2023, the circuit court conducted a hearing on the demurrers filed by the contractors in response to the amended complaint.

During the hearing, the contractors contended that the appellants' assertion that they "were innocent third-party landowner[s] . . . damaged by this flood," outside of the contracts for the Project, was erroneous since the records adduced by the motions craving oyer showed that "the [government] plaintiff[s] [were] not a third party[] [as] [t]hey are inextricably intertwined with the Virginia Health Systems Authority, which was the contracting entity." As a result, they further contended that the appellants were required to seek remedies solely in contract since VCU and the Authority are separate "subdivisions" of the Commonwealth, causing the *Commonwealth* to be the real party in privity with the contractors, through its relationship with the Authority. The contractors also contended that based upon the lease between the Authority and VCU in the record as a result of the motion craving oyer, it was clear that by suing in tort, the appellants were "trying to skip . . . their lease and just go around the contracts that the Authority had and that the Authority's contractors, design professionals, and their subcontractors and subconsultants, and sue for economic loss instead of following in the lines of contractual privity."

The contractors further asserted that the appellants' negligence per se claim should be barred through application of the judicial estoppel doctrine since the claim had been brought previously "in 2019 in the name of the Comptroller General" under the same complaint against the same contractors. The contractors also noted that in that previous case a demurrer was sustained "on the standing issue that the Comptroller General [did not have] standing to assert the claims that it was seeking to assert," causing it to decline to address the other issues raised. The contractors further contended that since the original complaint before the circuit court in the instant case was substantially similar to the previous complaint in the Comptroller General case

and the amended complaint's allegations deviated factually from the original complaint concerning the proximity of the Tunnel II excavation to the utility line, the judicial estoppel doctrine should bar consideration of the appellants' UUDPA negligence per se claim.

Finally, the contractors claimed that they did not trespass because they were authorized to be in the tunnel and on the property "by contract." They further argued that the water that flooded Sanger Hall originated in a subterranean water line, and therefore it could not constitute "surface water" for purposes of the "common enemy doctrine."

In response, the appellants contended that the source of duty for the conduct in question was in tort since there was no privity between the appellants and the Authority. They further explained that the only support for the contractors' contention that the appellants and the Authority were not distinct entities stemmed from alleged facts from all the previous motions craving oyer. The appellants next alleged that the contractors' judicial estoppel argument rested on "conflat[ing] the difference between the measurements . . . we're excavating on the surface, versus the distance to the line itself when you're going under it," causing nothing in the pleadings to be inconsistent. Finally, in support of the trespass to land claim, the appellants asserted that the contractors mischaracterized the water that flooded the property as "surface water" and that because the contractors "did not take due care" with working around the "underground, water main pressure water pipe" a trespass occurred when the water entered Sanger Hall. The circuit court took the matter under advisement.

On December 6, 2023, after considering the record, oral argument, and the documents obtained through granting motions craving oyer, the circuit court issued a final order sustaining the demurrers to the amended complaint without granting further leave to amend. With respect to the negligence claims, the circuit court based its dismissal primarily on the economic loss and source of duty rules. The circuit court reasoned that the economic loss doctrine applied since

- 10 -

"[t]he negligence allegations made under the complaint arise from the contract between Plaintiffs and Defendants and any damages would have to be brought as a breach of contract." The court further explained that, in applying the source of duty doctrine, the "damages being claimed by Plaintiffs arise out of multiple contracts among the Defendants and the breach of duties based on the contracts" within the record and "the Plaintiffs' Amended Complaint does not properly infer that the Defendants have a duty outside of alleged contractual promises and thus, Plaintiffs cannot recover with independent torts." The circuit court also found that the UUDPA negligence per se claim was barred by the judicial estoppel doctrine because "[i]n sustaining the Demurrer to Count XI of the original Complaint, the Court relied on Plaintiffs' allegations as to the proximity of the tunnel to the water main in finding that the Plaintiffs failed to state a claim for negligence per se." Accordingly, "[t]he doctrine of judicial estoppel preclude[d] the Plaintiffs from now pleading contradictory facts in an attempt to fit within the requirements of the [UUDPA]." The circuit court also sustained the demurrer to the trespass count, holding that the contractors "were authorized to be working on the property at issue," and there was no claim that surface water caused the flooding of Sanger Hall. And the circuit court reasoned that since any damages in question stemmed from a contract, the "economic loss" doctrine barred the common law trespass claim. The appellants appealed the circuit court's judgment on December 6, 2023.

This Court then heard oral argument on this matter on April 8, 2025. After considering the record on appeal, the parties' briefs, and oral argument, this Court issued a memorandum opinion on July 22, 2025, reversing the circuit court and remanding for further proceedings. On August 5, 2025, the contractors filed a petition for rehearing. This Court granted the petition and now reissues its opinion, correcting a factual error.

## II. ANALYSIS

### A. *Standard of Review*

"Reviewing a [circuit] court's decision to sustain a demurrer is a matter of law that is reviewed de novo." *Hazelwood v. Law. Garage, LLC*, 81 Va. App. 586, 594 (2024). Under Virginia law, "[t]he purpose of a demurrer is to determine whether the pleading and any proper attachments state a cause of action upon which relief can be given." *Young-Allen v. Bank of Am.*, 298 Va. 462, 467 (2020) (quoting *Steward v. Holland Fam. Props., LLC*, 284 Va. 282, 286 (2012)). "[A] demurrer stands or falls by what appears on the face of the pleading at which it is aimed," *Anderson v. Patterson*, 189 Va. 793, 798 (1949), and "tests the legal sufficiency of facts alleged in pleadings, not the strength of proof," *Seymour v. Roanoke Cnty. Bd. of Supervisors*, 301 Va. 156, 164 (2022) (quoting *Coutlakis v. CSX Transp., Inc.*, 293 Va. 212, 216 (2017)). "While a complaint need not 'descend into statements giving details of proof in order to withstand demurrer,' it must contain 'sufficient allegations of material facts to inform a defendant of the nature and character of the claim.'" *Hale v. Town of Warrenton*, 293 Va. 366, 368 (2017) (quoting *Assurance Data, Inc. v. Malyevac*, 286 Va. 137, 143 (2013)).

As previously stated by the Supreme Court, in reviewing a sustained demurrer we should be wary "of the dangers of 'short circuiting' litigation because in doing so, a [circuit] court 'depriv[es] a litigant of his day in court and depriv[es] this Court of an opportunity to review a [more] thoroughly developed record on appeal.'" *Walsh v. Bennett*, 260 Va. 171, 176 (2000) (all but first alteration in original) (quoting *Seyfarth, Shaw, Fairweather & Geraldson v. Lake Fairfax Seven Ltd. P'ship*, 253 Va. 93, 95 (1997)). "When, as in this case, the circuit court grants a demurrant's motion craving oyer, the circuit court in ruling on the demurrer may properly consider the facts alleged as amplified by any written documents added to the record as a result of the motion." *Dodge v. Trs. of Randolph-Macon Woman's Coll.*, 276 Va. 1, 5 (2008) (quoting *Ward's Equip., Inc. v. New Holland*

*N. Am., Inc.*, 254 Va. 379, 382 (1997)).  Where the record contains documents produced due to a motion craving oyer, "[a] circuit court 'considering a demurrer may ignore a party's factual allegations contradicted by the terms of authentic, unambiguous documents that properly are a part of the pleadings.'"  *Id.* (quoting *Ward's Equip.*, 254 Va. at 382).  Even though these documents may be considered as a part of the analysis, "a demurrer 'does not allow the court to evaluate and decide the merits of a claim'" as demurrers are not intended to end litigation prematurely before the parties can reach a trial on the merits.  *Assurance Data*, 286 Va. at 143 (quoting *Fun v. Va. Military Inst.*, 245 Va. 249, 252 (1993)).

Additionally, the determination of whether negligence has occurred, either under the common law or per se, and the determination of whether a trespass to land has occurred are "mixed question[s] of law and fact, because [they] involve[] both factual findings and the application of law to those facts."  *Buren v. Augusta Cnty.*, 66 Va. App. 441, 446 (2016).  In evaluating such mixed questions, "we give deference to the trial court's findings of fact and view the facts in the light most favorable to the prevailing party, but we review the trial court's application of the law to those facts *de novo*."  *Collins v. First Union Nat'l Bank*, 272 Va. 744, 749 (2006).  But "[b]ecause judicial estoppel is an equitable doctrine, 'invoked in the discretion of the [trial] court,' we . . . apply an abuse of discretion standard" to evaluate its application.  *Bentley Funding Grp., L.L.C. v. SK&R Grp., L.L.C.*, 269 Va. 315, 323-24 (2005) (second alteration in original) (quoting *King v. Herbert J. Thomas Mem. Hosp.*, 159 F.3d 192, 196 (4th Cir. 1998)).

B. *The circuit court erred in sustaining the demurrer to the appellants' common law negligence claims.*

The appellants contend that the circuit court erred in applying the source of duty and economic loss doctrines to find that their asserted damages flow from a contractual relationship. They further claim that they "explicitly pleaded that no contracts existed" between these parties and

that these doctrines were thus inapplicable as the contractors "owed a duty to those not in privity who might be injured by their negligent actions." We agree.

To begin, for the court to determine "whether a cause of action sounds in tort, contract, or both, 'the source of the duty violated must be ascertained.'" *Tingler v. Graystone Homes, Inc.*, 298 Va. 63, 81 (2019) (quoting *MCR Fed., LLC v. JB&A, Inc.*, 294 Va. 446, 458 (2017)). In making this determination, we examine the specific nature of the negligence allegations:

> If the cause of complaint be for an *act of omission or non-feasance* which, without proof of a contract to do what was left undone, would not give rise to any cause of action (*because no duty apart from contract to do what is complained of exists*) then the action is founded upon contract, and not upon tort. If, on the other hand, the relation of the plaintiff and the defendants be such that a duty arises from that relationship, irrespective of the contract, to take due care, and the defendants are negligent, then the action is one of tort.

*Id.* (quoting *Richmond Metro. Auth. v. McDevitt St. Bovis, Inc.*, 256 Va. 553, 558 (1998)). "Thus, it is the nature of the *dispute* and not the *remedy* sought that determines whether an action is based upon a contract." *Montalla, LLC v. Commonwealth*, 303 Va. 150, 167 (2024) (emphases added). If the source of the duty in question is determined to stem from contract, *then* the economic loss doctrine applies to bar the recovery related to "[n]othing more than disappointed economic expectations" arising from the contractual "package." *Sensenbrenner v. Rust, Orling & Neale, Architects, Inc.*, 236 Va. 419, 425 (1988); *see Abi-Najm v. Concord Condo., LLC*, 280 Va. 350, 361 (2010) (holding that "the question whether the economic loss doctrine applies requires a court first to determine 'whether a cause of action sounds in contract or tort'" (quoting *Richmond Metro.*, 256 Va. at 558)).

For the source of the duty to arise from contract the right the party seeks to vindicate must "flow from . . . contract." *Riddlesbarger v. Hartford Ins. Co.*, 74 U.S. 386, 391 (1869). In other words, for the source of duty rule to find that the damages suffered stem from contract, there must be at least 1) the existence of a contract from which duties may be owed, *see Kaltman v. All Am.*

- 14 -

*Pest Control, Inc.*, 281 Va. 483, 490-91 (2011) (delineating that tort damages in a contractor relationship are those that "were 'separate and independent wrongs that [went] beyond [the] contractual duties'" (alterations in original) (quoting *Richmond Metro.*, 256 Va. at 556)), and 2) that the parties to the suit are in privity or a similar relationship to invoke those contractual duties, *see Acordia of Va. Ins. Agency v. Genito Glenn, L.P.*, 263 Va. 377, 383 (2002) ("In order to recover [economic] losses, [appellee] was required to establish privity of contract between itself and [appellant]."). Where asserting the existence of contractual privity, however, "[n]o court can base its decree upon facts not alleged, nor render its judgment upon a right, however meritorious, which has not been pleaded and claimed." *Potts v. Mathieson Alkali Works*, 165 Va. 196, 207 (1935). It follows that for a party to assert that they, or another party, are entitled to sue under the contract, that party must raise the existence of such a relation in a pleading.[12] *See Copenhaver v. Rogers*, 238 Va. 361, 369 (1989) (noting that the appellants "never alleged that their grandparents and [appellee] entered a contract of which they were . . . beneficiaries); *Lerner v. Gudelsky, Co.*, 230 Va. 124, 132 (1985) ("A party seeking to recover on a contract right must allege . . . any express conditions precedent upon which his right of recovery depends.").

---

[12] For this purpose, "[p]leadings are the allegations made for the purpose of definitively presenting the issue or issues to be tried and determined." *Burch v. Grace Street Bldg. Corp.*, 168 Va. 329, 341 (1937), *superseded by statute*. They are "[t]he successive statements, now usually written, by which the plaintiff sets forth his cause and claim, and the defendant his defense." *Baylor v. Commonwealth*, 190 Va. 116, 121 (1949). Further, "[a]ll motions in writing, including a motion for a bill of particulars and a motion to dismiss, whether filed in paper document format or as electronic or digitally imaged filings, are pleadings." Rule 3:18(a). Because "[t]he issues in a case are made by the pleadings," regardless of whether raised in the form of a complaint or a motion, "the judicial tribunals, in determining the respective rights of litigants, cannot go beyond the issues thus made." *Potts*, 165 Va. at 223. Therefore, a passing reference at a potential contractual relationship, whether on brief or at oral argument, is insufficient to put the issue before the court without a pleading.

- 15 -

Here, the contractors argue that because the Authority is a governmental entity privity exists between the Authority and the Commonwealth and VCU, preventing them from claiming to be an "innocent third party." We find this contention misguided.

In entering contracts, governmental entities "act[] merely as an individual may do," and are generally subject to the same rules as private entities in vindicating their rights under such agreements. *Tait's Ex'r v. Cent. Lunatic Asylum*, 84 Va. 271, 276-77 (1888). And, even where private entities are concerned, the existence of contractual privity with one entity, standing alone, is insufficient to demonstrate that privity exists with an entity related to it. *See, e.g.*, *Richfood, Inc. v. Jennings*, 255 Va. 588, 592-93 (1998) (holding that a subsidiary is a separate corporate entity, and that status alone is not a justification for a court to disregard the separate corporate structure). Applying that wisdom here, it may be true that at least for sovereign immunity grounds that "'[t]he Commonwealth of Virginia' is a political abstraction which embraces many entities and persons." *Wright v. Wiedower*, 56 Va. Cir. 470, 472 (Winchester 2001).[13] But this abstraction does not mean that the Commonwealth and its agencies are all one and the same for contractual purposes. *See Billups v. Carter*, 268 Va. 701, 711 (2004) (noting the difference between the Virginia Department of Corrections and the Commonwealth for purposes of determining a "proper party" for purposes of a suit). In fact, the Commonwealth and its agencies are "separate entit[ies]" and a contract claim against one does not *automatically* mean a contract claim against the other and vice versa. *Cuccinelli v. Rector & Visitors of the Univ. of Va.*, 283 Va. 420, 431 (2012) (noting the difference between the University of Virginia and the Commonwealth at large for evaluating certain claims). Hence, we must dismiss the contractors' assertion that because they contracted with the *Authority*, a government entity, the appellants are automatically implicated by the Project agreement and can

---

[13] Circuit court opinions, like unpublished decisions of this Court, "may be cited . . . as persuasive authority." *Hamilton v. Pro-Football, Inc.*, 69 Va. App. 718, 730 (2019); Rule 5A:1(f).

assert a right under that agreement without further consideration of the specific contracts in question.

Here, taking the factual allegations in the complaint as true, and considering the documents added to the record through the motion craving oyer, we find the circuit court erred in finding that the appellants' alleged harm sounds in contract and, as a result, would result in solely economic losses. The contractors' pleadings at the time of the demurrer asserted that the appellants were the *actual parties in interest* to the contract entered into by the Authority and no other theory of privity was advanced at that time. But, without the actual contracts in question, the circuit court's determination that the appellants' rights flowed through the Authority's contract was in essence, speculation, as the appellants had not alleged the existence of privity between them and the Authority. Though the record produced by the motion craving oyer contained a lease agreement that VCU was a party to involving the Authority and concerning the MCV campus and Sanger Hall, this instrument is not a substitute for the contracts in question from which the Authority and the contractors' rights flow. Although the leases could call into question the veracity of the appellants' assertions, without more, this Court may not disregard the appellants' well-pled factual assertions. Hence, we must take the appellants' assertion that there is no privity between them and the Authority as true because this lease does not "*contradict[ ]*" that assertion. *Dodge*, 276 Va. at 5 (emphasis added) (quoting *Ward's Equip.*, 254 Va. at 382). Therefore, the appellants' allegations concerning lack of privity in the amended complaint must be accorded their appropriate deference at the demurrer stage of the litigation.

As a result, without the contracts in question between the Authority and the parties in the record, the evidence before the circuit court reflected at most that a lessor-lessee relationship between VCU and the Authority existed, not that there was privity between the appellants and the contractors. Consequently, the circuit court's determination to that end was premature at the

- 17 -

demurrer stage of the litigation. Therefore, we reverse the circuit court's decision to sustain the contractor's demurrers on the common law negligence claims.

    C. *The circuit court erred in finding the judicial estoppel doctrine barred consideration of the appellants' UUDPA negligence per se claim.*[14]

The appellants further assign error to the circuit court's decision to apply the judicial estoppel doctrine to bar consideration of their UUDPA negligence per se claim on the grounds that it relied on their factual allegations in the original complaint, which they altered in their amended complaint in a manner the circuit court found to be contradictory. In support, the appellants claim that by virtue of timely submitting an amended complaint, the original complaint was rendered a nullity that prevented its allegations from triggering the doctrine's application. We agree.

While "[t]he expression 'judicial estoppel' is relatively new in the lexicon of law[,] . . . the concept has ancient roots and 'derives from the prohibition in Scottish law against approbation and reprobation.'" *Wooten v. Bank of Am., N.A.*, 290 Va. 306, 309 (2015) (quoting *Lofton Ridge, LLC v. Norfolk S. Ry. Co.*, 268 Va. 377, 381 (2004)). "[J]udicial estoppel forbids parties from 'assum[ing] successive positions in the course of a suit, or series of suits, in reference to the same fact or state of facts, which are inconsistent with each other, or mutually contradictory." *Taylor v. Aids-Hilfe Koln, e.V.*, 301 Va. 352, 359 (2022) (alterations in original) (quoting *Lofton Ridge, LLC*, 268 Va. at 380-81). "[I]f the inconsistent positions involve different proceedings, the parties to the proceedings *must be the same*, and the inconsistent position must have been relied upon by the court or prior court in rendering its decision." *D'Ambrosio v. Wolf*, 295 Va. 48, 58 (2018) (emphasis added) (quoting *Va. Elec. & Power Co. v. Norfolk S. Ry. Co.*, 278 Va. 444, 462 (2012)). Thus, it is "fundamental . . . that 'the party sought to be estopped must be seeking to adopt a position [of fact]

---

[14] Since we agree with the appellants that the circuit court erred for the reasons stated in assignment of error two, we decline to opine on the alleged alternative grounds for error in assignment of error three as we resolve this case "on the best and narrowest grounds available." *Harris v. Wash. & Lee Univ.*, 82 Va. App. 175, 205 n.15 (2024).

- 18 -

that is inconsistent with a stance taken in a prior litigation." *Id.* (second alteration in original) (quoting *Bentley Funding*, 269 Va. at 326).

In terms of reliance on a pleading, a litigant's pleading is binding on them "*[u]nless amended.*" *Berry v. Klinger*, 225 Va. 201, 207 (1983) (emphasis added). The lack of reliance on an original complaint stems from the ancient rule that an amended complaint replaces the original, unless the face of the amended complaint clearly demonstrates a different intention.[15] *See Power v. Ivie*, 34 Va. (7 Leigh) 147, 151-52 (1836) (seriatim opinion). So, when an amended complaint "is filed and a comparison of the original and amended pleading shows that the amended [complaint], was intended as a substitute for the original, the case stands as though the original had never been filed, *so far as it relates to the statement of facts*." *Breeding by Breeding v. Hensley*, 258 Va. 207, 212 (1999) (emphasis added) (citing *Trotter v. E. I. Dupont De Nemours & Co.*, 124 Va. 680, 682-83 (1919)).

Here, since the appellants' original complaint was rendered a legal nullity by their filing of the amended complaint as ordered by the circuit court, the circuit court erred in finding such an amendment to trigger the judicial estoppel doctrine. As the Supreme Court of Virginia has opined, "[a]t the heart of judicial estoppel is the view that no litigant should be 'permitted to deny that which they have deliberately and solemnly asserted and received as true.'" *Wooten*, 290 Va. at 312 (quoting Simon Greenleaf, *A Treatise on the Law of Evidence* 27-28 (12th ed. 1866)). Where a trial court grants a litigant leave to amend their pleadings, the court expressly permits the denial that would otherwise be prohibited, allowing the litigant another opportunity to properly plead their

---

[15] Before January 1, 2006, actions at law were commenced by filing a "motion for judgment" or a declaration. Rules 3:1; 3:2. Since then, all civil actions are commenced by filing a "complaint." *Id.* Though *Power v. Ivie*, 34 Va. (7 Leigh) 147 (1836), was a seriatim opinion of the Supreme Court of Virginia, its separate holdings found that upon amending, the original declaration, the complaint of the time, the original was rendered a nullity. *See Power*, 34 Va. (7 Leigh) at 151 (Brockenbrough, J.); *id.* at 151-52 (Cabell, J.).

case. *See, e.g.*, Code § 8.01-281(A)-(B) (allowing the practice pleading in the alternative); Code § 8.01-272 (allowing "[i]n any civil action, a party may plead as many matters, whether of law or fact, as he shall think necessary"); Rule 1:4(K) (allowing alternative pleading). Per this permission, the appellants made no contradictory assertion through their amended complaint. In fact, as the amended complaint did not refer to the original complaint, the appellants made *no assertions* to the circuit court as a matter of law through their replaced pleading. *Breeding*, 258 Va. at 212. Hence, the circuit court erred in finding that the judicial estoppel doctrine applied to the appellants' negligence per se claim. Therefore, we reverse its judgment and remand the negligence per se claims to the circuit court.

D. *The circuit court erred in sustaining the demurrer against the trespass to land claim.*

Lastly, the appellants contend that the circuit court erred in sustaining the demurrer to their common law trespass to land claim. In support, the appellants assign error to the circuit court's finding that the "Defendants were authorized to be working on the property at issue," claiming that determination was an improper factual determination for demurrer, and, as pleaded, the amended complaint showed that the contractors "lacked any right, authority or invitation to discharge water onto the property." We agree.

At the common law, "[a] trespass is an unauthorized entry onto property which results in interference with the property owner's possessory interest therein." *Cooper v. Horn*, 248 Va. 417, 423 (1994) (quoting 5 Richard R. Powell, *The Law of Real Property* 707 (Patrick J. Rohan ed., 1994)). "[A]n action for common law trespass to land derives from the 'general principle of law [that] every person is entitled to the exclusive and peaceful enjoyment of his own land, and to redress if such enjoyment shall be wrongfully interrupted by another.'" *Kurpiel v. Hicks*, 284 Va. 347, 353 (2012) (second alteration in original) (quoting *Tate v. Ogg*, 170 Va. 95, 99 (1938)). Moreover "[t]o recover for trespass to land, a plaintiff must prove an invasion that interfered with

the right of exclusive possession of the land." *Collett v. Cordovana*, 290 Va. 139, 145 (2015) (quoting *Kurpiel*, 284 Va. at 353-54). "Any physical entry upon the surface of the land constitutes such an invasion, whether the entry is a walking upon it, *flooding it with water*, casting objects upon it, or otherwise." *Kurpiel*, 284 Va. at 354 (emphasis added) (quoting *Cooper*, 248 Va. at 423). And such trespass by flood can occur even if the water in question was not surface water.[16] *See, e.g.*, *Hampton Rds. Sanitation Dist. v. McDonnell*, 234 Va. 235, 240 (1987) (finding the discharge of sewage by a sanitation district to constitute such a trespass where evidence established that the defendant "designed, constructed, owned, operated, and controlled" the device that caused the flooding); *Akers v. Mathieson Alkali Works*, 151 Va. 1, 8, 17-18 (1928) (noting that a defendant manufacturer committed trespass by flood by permitting "muck and muck liquor" to escape a storage basin on its property); *see also Lee v. Evatt*, 114 Va. Cir. 253, 254, 262 (Fairfax 2024) (finding that trespass to land occurred when "water leaked from the [apartment] unit above [plaintiff's unit], owned by [defendant]").

Further, juxtaposing this requirement, "[i]t is axiomatic that a party cannot collect damages based on theories of waste or trespass when the party *consented* to the very actions alleged to constitute trespass or waste." *Vicars v. First Va. Bank-Mountain Empire*, 250 Va. 103, 109 (1995) (emphasis added). Such authorization or "[p]ermission" can occur through a contractual license which "has been described as a right, given by some competent authority[,] to do an act which without such authority would be *illegal, a tort, or a trespass*." *Horn v. Webb*, 302 Va. 70, 80 (2023) (second alteration in original) (emphasis added) (quoting *Bunn v. Offutt*, 216 Va. 681, 683 (1976)).

---

[16] Contrary to the circuit court and the contractors' contention, the common enemy does not apply to the government plaintiffs' theory of trespass to land as the doctrine applies to surface water and "[s]urface water is defined as water diffused over the surface of the ground . . . until it reaches some well defined channel," and this definition of "surface water" does not encompass water contained within a pressurized water line. *Mullins v. Greer*, 226 Va. 587, 589 (1984) (second alteration in original) (quoting *Howlett v. City of S. Norfolk*, 193 Va. 564, 568 (1952)).

Permission to be on the property by license is constrained by the terms of the license. *See Hardy v. McCullough*, 64 Va. (23 Gratt.) 251, 265 (1873). As such, "even if the entry of the defendants was [initially] lawful, if, after the entry, they, in their conduct, exceeded their authority, by doing some act which they had no right to do, the law will consider them as trespassers *ab initio*." *McClannan v. Chaplain*, 136 Va. 1, 11 (1923).

Here, as the contractors were in the Sanger Hall ventilation shaft to perform work pursuant to the Project contract for the Authority, we conclude that they had permission to be there subject to a contractual license. *Branner v. Kaplan*, 138 Va. 614, 619 (1924) (holding that under Virginia law a lessee has a right to "use the [leased] premises for any lawful purpose consistent with the character of the premises"). Specifically, the appellants' alleged trespass is that the water line rupture was "caused by the [contractors'] negligent design and construction" and "[t]he massive discharge of water onto the Commonwealth's land and the Sanger Hall building was without right, authority, or invitation." As the work in the ventilation shaft was pursuant to the Authority's status as a lessee and the record contains no evidence that the appellants objected to the contractors being in the *ventilation shaft*, these pleadings and the documents in the record show the contractors' presence in the shaft was authorized by contract.

But it is a different question altogether whether the water spilled as a result of the water line rupture exceeded the authority granted by that license. By itself, such flooding would constitute an "invasion" for purposes of a trespass action. *Kurpiel*, 284 Va. at 354. The appellants also contend that they never gave the contractors authority to discharge the water into Sanger Hall, and the contractors allege that such discharge stemmed from the contracted services, which the Authority specifically requested and the plaintiffs consented to when they approved the Project. *See Vicars*, 250 Va. at 109. As aforementioned, the contracts between the Authority and the contractors were not in the record before the circuit court. And this absence is critical here. With these allegations

- 22 -

present, the circuit court could only sustain the demurer if it was clear from the records obtained through the motion craving oyer that the allegations "were contradicted by the terms" in the documents in the record. *Dodge*, 276 Va. at 5 (quoting *Ward's Equip.*, 254 Va. at 382). Without the contracts, we cannot make that determination.

Viewing the pleadings with the deference they are accorded, we conclude that if proven to be true, even with the putative contractual license provided by the lease, the contractors' authority to operate there would be exceeded when the water line ruptured and flooded Sanger Hall, rendering the contractors "trespassers *ab initio*" as pleaded. *McClannan*, 136 Va. at 11. Thus, the circuit court's determination on demurrer that the contractors had permission to flood Sanger Hall subject to the Project agreement was a premature decision on a question of fact, inappropriate for the circuit court's determination on demurrer. Therefore, we reverse the circuit court's judgment sustaining the demurrer against the common law trespass to land claims.

III. CONCLUSION

In conclusion, we find that the circuit court erred by prematurely dismissing the common law negligence and trespass to land claims on demurrer, and further erred in applying the judicial estoppel doctrine to bar consideration of its UUDPA negligence per se claims. A demurrer must not be used to "deprive[] a litigant of his day in court [or] deprive[] this Court of an opportunity to review a [more] thoroughly developed record on appeal," *Walsh*, 260 Va. at 176 (fourth alteration in original) (quoting *Seyfarth, Shaw, Fairweather & Geraldson*, 253 Va. at 95), and the circuit court's decision to sustain the demurrer on the appellants' negligence and trespass claims constituted such a "premature" dismissal due to the lack of pertinent contracts, *Assurance Data*, 286 Va. at 143 (quoting *Fun*, 245 Va. at 252).

We further hold that the circuit court erred in applying the judicial estoppel doctrine to bar the appellants' negligence per se claims as that doctrine is not triggered by differing factual

allegations between an original and an amended complaint (where the amended complaint does not incorporate the original by reference) because the amended complaint in such a case serves as a "substitute for the original," rendering the original a nullity as matter of law that does not constitute a factual assertion for purposes of the doctrine. *Breeding*, 258 Va. at 212 (citing *Trotter*, 124 Va. at 682-83). Therefore, for the foregoing reasons, the circuit court's judgment is reversed and remanded for further proceedings consistent with this opinion.

*Reversed and remanded.*

## VIRGINIA:

*In the Court of Appeals of Virginia on* **Wednesday** *the* **5th** *day of* **November, 2025**.

Commonwealth of Virginia, et al.,          Appellants,

 against        Record No. 0021-24-2
                 Circuit Court No. CL21-0923

Jones Lang LaSalle Americas, Inc., et al.,          Appellees.

Upon a Petition for Rehearing

Before AtLee, Athey and Callins

On August 5, 2025 came appellees, by counsel, and filed a petition praying that the Court set aside the judgment rendered herein on July 22, 2025, and grant a rehearing thereof.

On consideration whereof, the petition for rehearing is granted, the opinion rendered on July 22, 2025 is withdrawn, the mandate entered on that date is vacated, and this appeal will be reconsidered by the panel of judges that originally considered the matter.

A Copy,

Teste:

A. John Vollino, Clerk

By:    *original order signed by a deputy clerk of the*
       *Court of Appeals of Virginia at the direction*
       *of the Court*

Deputy Clerk

COURT OF APPEALS OF VIRGINIA

Present: Judges AtLee, Athey and Callins
Argued at Richmond, Virginia


COMMONWEALTH OF VIRGINIA, ET AL.

                                                    MEMORANDUM OPINION* BY
v.         Record No. 0021-24-2                JUDGE CLIFFORD L. ATHEY, JR.
                                                         JULY 22, 2025
JONES LANG LASALLE AMERICAS, INC., ET AL.


              FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                          Clarence N. Jenkins Jr., Judge

              Curtis G. Manchester, Senior Assistant General Attorney (Jason S.
              Miyares, Attorney General; Leslie A.T. Haley, Deputy Attorney
              General; Chandra D. Lantz, Senior Assistant Attorney
              General/Section Chief; Mathew A. Taylor, Senior Assistant Attorney
              General; Emma C. Greger, Assistant Attorney General, on briefs),
              for appellants.

              Edward V. Arnold (Steven J. Kmieciak; Seyfarth Shaw LLP, on
              brief), for appellees.

        This matter involves a complex legal dispute relating to a contract for excavation work

wherein a water main pipe located in an underground utility tunnel was breached thereby

resulting in the flooding of Sanger Hall, a building owned by the Commonwealth of Virginia and

located on the Medical College of Virginia ("MCV") campus of Virginia Commonwealth

University ("VCU"). On December 6, 2023, the Circuit Court for the City of Richmond ("circuit

court") sustained joint demurrers filed by a group of contractors and sub-contractors who

performed work pursuant to the excavation contract including Jones Lang LaSalle Americas,

Inc., ("Jones Lang LaSalle"), Draper Aden Associates, Inc., ("Draper Aden"), Skanska USA

Building Inc., ("Skanska USA"), Bradshaw Construction Corporation, ("Bradshaw

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

Construction"), RMF Engineering, Inc., P.C. ("RMF Engineering"), Randolph P. Rivinus, P.E.

("Rivinus"), and Kenton James Balenske, P.E. ("Balenske") (collectively the "contractors"). The

circuit court dismissed the amended complaint filed by the Commonwealth of Virginia and

VCU[1] (collectively the "appellants") which sought to recover tort damages from the contractors

as a result of the flooding of Sanger Hall.[2] The appellants assign error to the circuit court's

dismissal of their amended complaint on three grounds: 1) the circuit court erred in applying the

economic loss doctrine and source of duty rule after finding that the appellants failed to plead

that their alleged damages were in tort and not arising from the underlying contract; 2) the circuit

court erred when it found that the doctrine of judicial estoppel barred consideration of the

appellants' negligence per se claims pursuant to the Underground Utility Damage Prevention

Act, ("UUDPA")[3] because pertinent factual allegations were changed between the filing of the

original and amended complaints; and 3) the circuit court erred by determining that the

contractors were "authorized" to be in the utility tunnel connected to Sanger Hall because that

particular determination is a finding of fact and a legal conclusion and therefore should not have

been decided by the circuit court at the demurrer stage. For the reasons that follow, we reverse

the circuit court's judgment and remand for further proceedings.

---

[1] VCU is an agency of the Commonwealth of Virginia authorized by statute. Code § 23.1-2305.

[2] The Commonwealth and VCU later withdrew its appeal against contractors, Draper Aden, RMF Engineering, Rivinus, and Balenske. Thus, this appeal concerns only Jones Lang LaSalle, Skanska USA, and Bradshaw Construction.

[3] The UUDPA, is contained within Code §§ 56-265.14 to -265.29 and is popularly known as the "Miss Utility" Act). *Chesapeake & Potomac Tel. Co. v. Properties One*, 247 Va. 136, 139 n.1 (1994). The UUDPA "requires excavation or demolition work to be preceded by at least 48 hours' advance notification to all entities furnishing or transporting materials or services by means of underground utility lines." *Id.* (citing Code §§ 56-265.15; 56-265.17).

I. Background[4]

A. *The Utility Pathway Project to assist in the creation of the Children's Pavilion for the VCU Health System Authority*

This case arises out of excavation and construction services provided to assist in the design and construction of an outpatient facility to be located at VCU's MCV campus and named the Children's Pavilion Hospital ("Pavilion") (collectively the "Project"). The Project was developed by the VCU Health System Authority[5] (the "Authority"). In addition to the 14-story Pavilion, the Project also provided for a utility pathway ("Utility Pathway") to connect the Pavilion to pre-existing underground steam lines and other underground utilities which were located within an existing utility tunnel ("Tunnel I"). Tunnel I connected the Pavilion to Sanger Hall under 11th Street.

Sanger Hall is managed by VCU, owned by the Commonwealth, and located on VCU's MCV campus. Code § 23.1-2302 (assigning VCU responsibility for property management). Sanger Hall also houses the academic, administrative, and laboratory facilities for VCU's School

---

[4] Since the circuit court dismissed the Commonwealth and VCU's case on demurrer, this "recitation of the facts, of course, restates only factual allegations that, even if plausibly pleaded, are as yet wholly untested by the adversarial process." *A.H. ex rel. C.H. v. Church of God in Christ, Inc.*, 297 Va. 604, 614 (2019). Hence, in reviewing the circuit court's judgment, "we accept as true all factual allegations expressly pleaded in the complaint and interpret those allegations in the light most favorable to" the Commonwealth and VCU. *Coward v. Wellmont Health Sys.*, 295 Va. 351, 358 (2018). "Additionally, when, as here, a circuit court sustains a demurrer to an amended complaint that does not incorporate or refer to any of the allegations that were set forth in a prior complaint, 'we will consider only the allegations contained in the amended pleading to which the demurrer was sustained.'" *Lewis v. Kei*, 281 Va. 715, 719 (2011) (quoting *Yuzefovsky v. St. John's Wood Apartments*, 261 Va. 97, 102 (2001)). But, in doing so, we may "not admit 'inferences or conclusions from facts not stated.'" *Friends of the Rappahannock v. Caroline Cnty. Bd. of Supervisors*, 286 Va. 38, 44 (2013) (quoting *Arlington Yellow Cab Co. v. Transp., Inc.*, 207 Va. 313, 319 (1966)). And we may consider facts adduced by attached exhibits and a motion craving oyer. *See Hechler Chevrolet, Inc. v. General Motors Corp.*, 230 Va. 396, 398 (1985).

[5] The Authority was formerly known as the Medical College of Virginia Hospitals Authority. Despite contracting for the Project, however, the Authority is not a party to this lawsuit.

of Medicine. In addition, areas within Sanger Hall were explicitly leased by VCU to the Authority and the lease ceded certain rights to the Authority with respect to Sanger Hall.[6] During construction, Sanger Hall's exterior ventilation area was protected by a grated cover located between the building's outer wall and a retaining wall parallel to a neighboring street. The ventilation area also demarcated the location of subterranean cables but failed to identify the location of subterranean waterlines.

The Authority developed the Project's specifications.[7] Based upon those specifications, the Utility Pathway for the Project was to travel through the exterior ventilation area of Sanger Hall and then through a new tunnel to be constructed under 12th Street to connect to Tunnel I ("Utility Tunnel II"). The purpose for the Project's excavation work was to permit the Utility Pathway to serve the Pavilion's new outpatient facility by connecting it to existing steam lines and other utilities coming from the main VCU hospital. Sanger Hall was to be connected to the Project through its ventilation area and Utility Tunnel II. In forming the Project team, the Authority separately contracted with a group of firms: Jones Lang LaSalle, Drapen Aden, and Skanska USA, who subcontracted with Bradshaw Construction, RMF Engineering, Rivinus, and Balenske.[8] Neither the Commonwealth nor VCU were parties to these contracts.

---

[6] The lease became part of the record through the contractors' motion craving oyer.

[7] The General Assembly has statutorily empowered the Authority to manage hospitals and medical facilities at the MCV campus. Code § 23.1-2404(A)-(B); Code § 23.1-2412. In addition, the Authority is managed by a board of twenty-one directors "made up of representatives of the Commonwealth and of VCU." Code § 23.1-2402(A). Further, the Authority has the power to "plan, design, construct . . . any project" such as "any health care, research, or educational facility or equipment necessary or convenient to or consistent with the purposes of the Authority, whether owned by the Authority." Code § 23.1-2400 (defining the term "project"); Code § 23.1-2401(B)(6); Code § 23.1-2405.

[8] The contracts executed by the Authority are not in the record before this Court.

In November of 2013, with the team of general contractors and subcontractors in place, Bradshaw Construction began tunnel excavation under 12th Street, working primarily in the ventilation area of Sanger Hall among other sites under Skanska USA's supervision.

B. *The incident in question as alleged by the appellants*

On November 25, 2013, tunnel excavation work continued under 12th Street "extremely close to, if not directly under, the [City of Richmond's] existing 10" water line." Shortly after 1:00 p.m. that day, the foreman for Bradshaw Construction's crew "observed a 'trickle' of water coming into the face of the tunnel." The foreman then called the assigned project manager for Bradshaw Construction to report the apparent leak. Neither Skanska USA nor Bradshaw Construction ordered the tunneling work stopped despite the foreman's concerns. Around 1:30 p.m., Bradshaw's project manager contacted Skanska USA's project superintendent again to report that water was leaking into the tunnel. However, neither Skanska USA nor Bradshaw Construction instructed the work crew to stop tunneling. Instead, Skanska's project superintendent immediately traveled to the work site to inspect the tunnel. During his inspection, the project superintendent observed water leaking into the tunnel to the extent that water covered the boards holding the tunnel face in place. By "approximately 1:49 p.m., six minutes after the Skanska [USA] superintendent . . . arrived at [work site] and as Bradshaw continued tunnel construction, the drilling disturbed the City of Richmond's 10" water line, which broke. The full flow of the severed waterline filled the tunnel and chased the workers out of the tunnel and ventilation area." After reviewing the damage, the contractors noted that the "excavation operations caused the rupture by directly impacting the 10" water line and/or disturbing the soil surrounding the 10" water line to such an extent that its existing support was materially

compromised, causing a failure."[9] For the two hours following the water line rupture, water was observed continuing to flow out of the ruptured line. The flow of water into the tunnel was unabated until the Richmond Department of Public Utilities arrived at the work site and successfully closed the valves that permitted water to flow into the 10" line. "Due to the massive influx of water into Sanger Hall, including the building's mechanical and electrical rooms, Dominion Power Company was forced to turn off power to the entire building as well as two adjacent buildings and to evacuate the buildings." The line rupture resulted in debris and water flooding Tunnel II and the Sanger Hall exterior ventilation area. The water later entered through louvered windows into the mechanical room in the Sanger Hall B3 level basement, disrupting operations throughout the Sanger Hall.[10]

C. *The ensuing litigation*

On March 4, 2021, the appellants, asserting no contractual privity, sued the contractors for 1) negligence; 2) negligence per se under the UUDPA; and 3) trespass to land, stemming from the water line rupture caused by the contractors' "design and construction" efforts. In support of these claims, the appellants alleged that the contractors "knew, or should have known," of "the existing conditions for underground utilities in an urban area such as downtown Richmond in general" as such knowledge is common for firms in the construction industry operating in the area. The appellants further contended that the contractors neglected "existing infrastructure conditions . . . and poor soil conditions" when both designing and constructing Tunnel II as a part of the Project. The appellants further alleged that the contractors knew that

[9] As understood and used by the parties, the 10" water line in question was a large-diameter pipe that allowed water to enter the properties, the Pavilion and Sanger Hall, among others in that area of Richmond, which here was located under the roadway (within the bounds of the excavation) and connected directly to the public main water distribution line.

[10] In contrast, the appellants' original complaint alleged that flooding also included the Sanger Hall ventilation shaft.

- 6 -

Tunnel II "would be built where it could disturb or damage many utility lines and facilities during construction." The appellants also contended that the flooding from the ruptured waterline caused extensive property damage to Sanger Hall requiring remediation, restoration, and repair services to the building including the replacement and decontamination of scientific equipment, furniture, and other personal property impacted by the flood. They also claimed an additional loss arising from the flood in the form of an impaired ability to conduct operations at Sanger Hall, including the lost scientific research in progress at the time of the flooding, lost funding for that scientific research, and increased costs to restart those operations. As a result, the appellants prayed for relief in the form of damages of not less than $7,642,685.

On November 18, 2021, the contractors demurred to the original complaint, asserting that the source of duty and economic loss rule doctrines barred the appellants' recovery in negligence because their alleged harms stemmed from contract. The demurrer further contended that the plaintiffs failed to plead a violation of the UUDPA because their allegations did not establish as a factual predicate that the water line breach pre-existed the tunneling excavation. Finally, they argued that the plaintiffs' trespass to land claim failed to show that the alleged trespass was as "a direct result of some act committed" by the contractors or that their actions "diverted water" into Sanger Hall. The contractors also filed an accompanying motion craving oyer along with their demurrer, seeking documents that formed the basis of the appellants' complaint.

On August 17, 2022, the circuit court held a hearing on the motion craving oyer.[11] On October 13, 2022, the circuit court subsequently granted the motion craving oyer and ordered that the appellants produce the requested documents. The appellants produced certain documents in response to the circuit court's order including deeds relating to the

_____

[11] The record does not contain a transcript for both the hearing on the motion craving oyer and on the contractors' demurrer.

Commonwealth's ownership of land at Sanger Hall, leases it may have held with VCU and the Authority, Project contracts and purchase orders, and damages calculation information. The contracts produced by the appellants were solely between the contractors and the Authority. On March 7, 2023, the circuit court held a hearing on the contractors' demurrer. After considering the parties' oral and written arguments as well as the documents produced by the motion craving oyer, the circuit court entered an order sustaining the demurrer on March 9, 2023. In the order, the circuit court found that the appellants' complaint failed to state cognizable claims on each count. The circuit court did, however, grant the appellants leave to amend their original complaint.

On April 14, 2023, the appellants filed an amended complaint, reasserting the negligence, negligence per se, and trespass to land claims. The amended complaint also 1) altered references relating to the contractual obligations between the Authority and the contractors, 2) reduced the alleged distance between the excavation work and the utility line to "within two feet," consistent with the distance that triggers conduct proscribed by the UUDPA, and 3) revised their trespass allegations to assert that the water that entered Sanger Hall passed through "louvered windows" instead of through an "eight-foot diameter hole" in the ventilation shaft where the contractors were working. On May 15, 2023, the contractors filed additional motions craving oyer, seeking documents referred to in the amended complaint. They also filed demurrers to the amended complaint contending that the amended complaint failed for the same reasons the contractors identified in their first demurrer. The contractors also filed a plea in bar asserting that the amended complaint's allegations were barred by the statute of repose.[12] On July 13, 2023, the circuit court granted the motions craving oyer and ordered the production of the relevant

---

[12] The circuit court never ruled on the plea in bar.

- 8 -

documents. Subsequently, on October 13, 2023, the circuit court conducted a hearing on the demurrers filed by the contractors in response to the amended complaint.

During the hearing, the contractors contended that the appellants' assertion that they "were innocent third-party landowner[s] . . . damaged by this flood," outside of the contracts for the Project was erroneous since the records adduced by the motions craving oyer showed that "the [government] plaintiff[s] [were] not a third party[] [as] [t]hey are inextricably intertwined with the Virginia Health Systems Authority, which was the contracting entity." As a result, they further contended that the appellants were required to seek remedies solely in contract since VCU and the Authority are separate "subdivisions" of the Commonwealth, causing the *Commonwealth* to be the real party in privity with the contractors, through its relationship with the Authority. The contractors also contended that based upon the lease between the Authority and VCU in the record as a result of the motion craving oyer, it was clear that by suing in tort, the appellants were "trying to skip, . . . their lease and just go around the contracts that the Authority had and that the Authority's contractors, design professionals, and their subcontractors and subconsultants, and sue for economic loss instead of following in the lines of contractual privity."

The contractors further asserted that the appellants' negligence per se claim should be barred through application of the judicial estoppel doctrine since the claim had been brought previously "in 2019 in the name of the Comptroller General" under the same complaint against the same contractors. The contractors also noted that in that previous case a demurrer was sustained "on the standing issue that the Comptroller General [did not have] standing to assert the claims that it was seeking to assert," causing it to decline to address the other issues raised. The contractors further contended that since the original complaint before the circuit court in the instant case was substantially similar to the previous complaint in the Comptroller General case

and the amended complaint's allegations deviated factually from the original complaint concerning the proximity of the Tunnel II excavation to the utility line, the judicial estoppel doctrine should bar consideration of the appellants' UUDPA negligence per se claim.

Finally, the contractors claimed that they did not trespass because they were authorized to be in the tunnel and on the property "by contract." They further argued that the water that flooded Sanger Hall originated in a subterranean water line, and therefore it could not constitute "surface water" for purposes of the "common enemy doctrine."

In response, the appellants contended that the source of duty for the conduct in question was in tort since there was no privity between the appellants and the Authority. They further explained that the only support for the contractors' contention that the appellants and the Authority were not distinct entities stemmed from alleged facts from all the previous motions craving oyer. The appellants next alleged that the contractors' judicial estoppel argument rested on "conflat[ing] the difference between the measurements . . . we're excavating on the surface, versus the distance to the line itself when you're going under it," causing nothing in the pleadings to be inconsistent. Finally, in support of the trespass to land claim, the appellants asserted that the contractors mischaracterized the water that flooded the property as "surface water" and that because the contractors "did not take due care" with working around the "underground, water main pressure water pipe" a trespass occurred when the water entered Sanger Hall. The circuit court took the matter under advisement.

On December 6, 2023, after considering the record, oral argument, and the documents obtained through granting motions craving oyer, the circuit court issued a final order sustaining the demurrers to the amended complaint without granting further leave to amend. With respect to the negligence claims, the circuit court based its dismissal primarily on the economic loss and source of duty rules. The circuit court reasoned that the economic loss doctrine applied since

"[t]he negligence allegations made under the complaint arise from the contract between Plaintiffs and Defendants and any damages would have to be brought as a breach of contract." The court further explained that, in applying the source of duty doctrine, the "damages being claimed by Plaintiffs arise out of multiple contracts among the Defendants and the breach of duties based on the contracts" within the record and "the Plaintiffs' Amended Complaint does not properly infer that the Defendants have a duty outside of alleged contractual promises and thus, Plaintiffs cannot recover with independent torts." The circuit court also found that the UUDPA negligence per se claim was barred by the judicial estoppel doctrine because "[i]n sustaining the Demurrer to Count XI of the original Complaint, the Court relied on Plaintiffs' allegations as to the proximity of the tunnel to the water main in finding that the Plaintiffs failed to state a claim for negligence per se." Accordingly, "[t]he doctrine of judicial estoppel preclude[d] the Plaintiffs from now pleading contradictory facts in an attempt to fit within the requirements of the [UUDPA]." The circuit court also sustained the demurrer to the trespass count, holding that the contractors "were authorized to be working on the property at issue," and there was no claim that surface water caused the flooding of Sanger Hall. And the circuit court reasoned that since any damages in question stemmed from a contract, the "economic loss" doctrine barred the common law trespass claim. The appellants appealed.

## II. ANALYSIS

### A. *Standard of Review*

"Reviewing a [circuit] court's decision to sustain a demurrer is a matter of law that is reviewed de novo." *Hazelwood v. Law. Garage, LLC*, 81 Va. App. 586, 594 (2024). Under Virginia law, "[t]he purpose of a demurrer is to determine whether the pleading and any proper attachments state a cause of action upon which relief can be given." *Young-Allen v. Bank of Am.*, 298 Va. 462, 467 (2020) (quoting *Steward v. Holland Fam. Props., LLC*, 284 Va. 282, 286 (2012)).

- 11 -

"[A] demurrer stands or falls by what appears on the face of the pleading at which it is aimed," *Anderson v. Patterson*, 189 Va. 793, 798 (1949), and "tests the legal sufficiency of facts alleged in pleadings, not the strength of proof," *Seymour v. Roanoke Cnty. Bd. of Supervisors*, 301 Va. 156, 164 (2022) (quoting *Coutlakis v. CSX Transp., Inc.*, 293 Va. 212, 216 (2017)). "While a complaint need not 'descend into statements giving details of proof in order to withstand demurrer,' it must contain 'sufficient allegations of material facts to inform a defendant of the nature and character of the claim.'" *Hale v. Town of Warrenton*, 293 Va. 366, 368 (2017) (quoting *Assurance Data, Inc. v. Malyevac*, 286 Va. 137, 143 (2013)).

As previously stated by the Supreme Court, in reviewing a sustained demurrer we should be wary "of the dangers of 'short circuiting' litigation because in doing so, a [circuit] court 'deprives a litigant of his day in court and deprives this Court of an opportunity to review a [more] thoroughly developed record on appeal." *Walsh v. Bennett*, 260 Va. 171, 176 (2000) (second alteration in original) (quoting *Seyfarth, Shaw, Fairweather & Geraldson v. Lake Fairfax Seven Ltd. P'ship*, 253 Va. 93, 95 (1997)). "When, as in this case, the circuit court grants a demurrant's motion craving oyer, the circuit court in ruling on the demurrer may properly consider the facts alleged as amplified by any written documents added to the record as a result of the motion." *Dodge v. Trs. of Randolph-Macon Woman's Coll.*, 276 Va. 1, 5 (2008) (quoting *Ward's Equip., Inc. v. New Holland N. Am., Inc.*, 254 Va. 379, 382 (1997)). Where the record contains documents produced due to a motion craving oyer, "[a] circuit court 'considering a demurrer may ignore a party's factual allegations contradicted by the terms of authentic, unambiguous documents that properly are a part of the pleadings." *Id.* (quoting *Ward's Equip.*, 254 Va. at 382). Even though these documents may be considered as a part of the analysis, "a demurrer 'does not allow the court to evaluate and decide the merits of a claim'" as demurrers are not intended to end litigation prematurely before the parties

- 12 -

can reach a trial on the merits. *Assurance Data*, 286 Va. at 143 (quoting *Fun v. Va. Military Inst.*, 245 Va. 249, 252 (1993)).

Additionally, the determination of whether negligence has occurred, either under the common law or per se, and the determination of whether a trespass to land has occurred are "mixed question[s] of law and fact, because [they] involve[] both factual findings and the application of law to those facts." *Buren v. Augusta Cnty.*, 66 Va. App. 441, 446 (2016). In evaluating such mixed questions, "we give deference to the trial court's findings of fact and view the facts in the light most favorable to the prevailing party, but we review the trial court's application of the law to those facts de novo." *Collins v. First Union Nat'l Bank*, 272 Va. 744, 749 (2006). But "[b]ecause judicial estoppel is an equitable doctrine, 'invoked in the discretion of the [trial] court,' we . . . apply an abuse of discretion standard" to evaluate its application. *Bentley Funding Grp., L.L.C. v. SK&R Grp., L.L.C.*, 269 Va. 315, 323-24 (2005) (second alteration in original) (quoting *King v. Herbert J. Thomas Mem. Hosp.*, 159 F.3d 192, 196 (4th Cir. 1998)).

B. *The circuit court erred in sustaining the demurrer to the appellants' common law negligence claims.*

The appellants contend that the circuit court erred in applying the source of duty and economic loss doctrines to find that their asserted damages flow from a contractual relationship. They further claim that they "explicitly pleaded that no contracts existed" between these parties and that these doctrines were thus inapplicable as the contractors "owed a duty to those not in privity who might be injured by their negligent actions." We agree.

To begin, for the court to determine "whether a cause of action sounds in tort, contract, or both, 'the source of the duty violated must be ascertained.'" *Tingler v. Graystone Homes, Inc.*, 298 Va. 63, 81 (2019*)* (quoting *MCR Fed., LLC v. JB&A, Inc.*, 294 Va. 446, 458 (2017)). In making this determination, we examine the specific nature of the negligence allegations:

> If the cause of complaint be for an *act of omission or non-feasance* which, without proof of a contract to do what was left undone, would not give rise to any cause of action (*because no duty apart from contract to do what is complained of exists*) then the action is founded upon contract, and not upon tort. If, on the other hand, the relation of the plaintiff and the defendants be such that a duty arises from that relationship, irrespective of the contract, to take due care, and the defendants are negligent, then the action is one of tort.

*Id.* (quoting *Richmond Metro. Auth. v. McDevitt St. Bovis, Inc.*, 256 Va. 553, 558 (1998)). "Thus, it is the nature of the *dispute* and not the *remedy* sought that determines whether an action is based upon a contract." *Montalla, LLC v. Commonwealth*, 303 Va. 150, 167 (2024) (emphases added). If the source of the duty in question is determined to stem from contract, *then* the economic loss doctrine applies to bar the recovery related to "[n]othing more than disappointed economic expectations" arising from the contractual "package." *Sensenbrenner v. Rust, Orling & Neale, Architects, Inc.*, 236 Va. 419, 425 (1988); *see Abi-Najm v. Concord Condo., LLC*, 280 Va. 350, 361 (2010) (holding that "the question whether the economic loss doctrine applies requires a court first to determine 'whether a cause of action sounds in contract or tort'" (quoting *Richmond Metro.*, 256 Va. at 558)).

For the source of the duty to arise from contract the right the party seeks to vindicate must "flow from . . . contract." *Riddlesbarger v. Hartford Ins. Co.*, 74 U.S. 386, 391 (1869). In other words, for the source of duty rule to find that the damages suffered stem from contract, there must be at least 1) the existence of a contract from which duties may be owed, *see Kaltman v. All Am. Pest Control, Inc.*, 281 Va. 483, 490-91 (2011) (delineating that tort damages in a contractor relationship are those that "were 'separate and independent wrongs that [went] beyond [the] contractual duties'" (alterations in original) (quoting *Richmond Metro.*, 256 Va. at 556)), and 2) that the parties to the suit are in privity or a similar relationship to invoke those contractual duties. *See Acordia of Va. Ins. Agency v. Genito Glenn, L.P.*, 263 Va. 377, 383 (2002) ("In order to recover [economic] losses, [appellee] was required to establish privity of contract between itself and

- 14 -

[appellant].").  Where asserting the existence of contractual privity, however, "[n]o court can base its decree upon facts not alleged, nor render its judgment upon a right, however meritorious, which has not been pleaded and claimed."  *Potts v. Mathieson Alkali Works*, 165 Va. 196, 207 (1935).  It follows that for a party to assert that they, or another party, are entitled to sue under the contract, that party must raise the existence of such a relation in a pleading.[13]  *See Copenhaver v. Rogers*, 238 Va. 361, 369 (1989) (noting that the appellants "never alleged that their grandparents and [appellee] entered a contract of which they were . . . beneficiaries); *Lerner v. Gudelsky, Co.*, 230 Va. 124, 132 (1985) ("A party seeking to recover on a contract right must allege . . . any express conditions precedent upon which his right of recovery depends.").

Here, the contractors argue that because the Authority is a governmental entity privity exists between the Authority and the Commonwealth and VCU, preventing them from claiming to be an "innocent third party."  We find this contention misguided.

In entering contracts, governmental entities "act[] merely as an individual may do," and are generally subject to the same rules as private entities in vindicating their rights under such agreements.  *Tait's Ex'r v. Cent. Lunatic Asylum*, 84 Va. 271, 276-77 (1888).  And, even where private entities are concerned, the existence of contractual privity with one entity, standing alone, is insufficient to demonstrate that privity exists with an entity related to it.  *See, e.g.*, *Richfood, Inc. v.*

_____

[13] For this purpose, "[p]leadings are the allegations made for the purpose of definitively presenting the issue or issues to be tried and determined." *Burch v. Grace Street Bldg. Corp.*, 168 Va. 329, 341 (1937), *superseded by statute*.  They are "[t]he successive statements, now usually written, by which the plaintiff sets forth his cause and claim, and the defendant his defense." *Baylor v. Commonwealth*, 190 Va. 116, 121 (1949).  Further, "[a]ll motions in writing, including a motion for a bill of particulars and a motion to dismiss, whether filed in paper document format or as electronic or digitally imaged filings, are pleadings." Rule 3:18(a).  Because "[t]he issues in a case are made by the pleadings," regardless of whether raised in the form of a complaint or a motion, "the judicial tribunals, in determining the respective rights of litigants, cannot go beyond the issues thus made." *Potts*, 165 Va. at 223.  Therefore, a passing reference at a potential contractual relationship, whether on brief or at oral argument, is insufficient to put the issue before the court without a pleading.

*Jennings*, 255 Va. 588, 592-93 (1998) (holding that a subsidiary is a separate corporate entity, and that status alone is not a justification for a court to disregard the separate corporate structure). Applying that wisdom here, it may be true that at least for sovereign immunity grounds that "'[t]he Commonwealth of Virginia' is a political abstraction which embraces many entities and persons." *Wright v. Wiedower*, 56 Va. Cir. 470, 472 (Winchester 2001).[14] But this abstraction does not mean that the Commonwealth and its agencies are all one and the same for contractual purposes. *See Billups v. Carter*, 268 Va. 701, 711 (2004) (noting the difference between the Virginia Department of Corrections and the Commonwealth for purposes of determining a "proper party" for purposes of a suit). In fact, the Commonwealth and its agencies are "separate entit[ies]" and a contract claim against one does not *automatically* mean a contract claim against the other and vice versa. *Cuccinelli v. Rector & Visitors of the Univ. of Va.*, 283 Va. 420, 431 (2012) (noting the difference between the University of Virginia and the Commonwealth at large for evaluating certain claims). Hence, we must dismiss the contractors' assertion that because they contracted with the *Authority*, a government entity, the appellants are automatically implicated by the Project agreement and can assert a right under that agreement without further consideration of the specific contracts in question.

Here, taking the factual allegations in the complaint as true, and considering the documents added to the record through the motion craving oyer, we find the circuit court erred in finding that the appellants' alleged harm sounds in contract and, as a result, would result in solely economic losses. The contractors' pleadings at the time of the demurrer asserted that the appellants were the *actual parties in interest* to the contract entered into by the Authority and no other theory of privity was advanced at that time. But, without the actual contracts in question, the circuit court's

---

[14] Circuit court opinions, like unpublished decisions of this Court, "may be cited . . . as persuasive authority." *Hamilton v. Pro-Football, Inc.*, 69 Va. App. 718, 730 (2019); Rule 5A:1(f).

- 16 -

determination that the appellants' rights flowed through the Authority's contract was in essence, speculation, as the appellants had not alleged the existence of privity between them and the Authority. Though the record produced by the motion craving oyer contained a lease agreement that VCU was a party to involving the Authority and concerning the MCV Campus and Sanger Hall, this instrument is not a substitute for the contracts in question from which the Authority and the contractors' rights flow. Although the leases could call into question the veracity of the appellants' assertions, without more, this Court may not disregard the appellants' well-pled factual assertions. Hence, we must take the appellants' assertion that there is no privity between them and the Authority as true because this lease does not "*contradict[]*" that assertion. *Dodge*, 276 Va. at 5 (emphasis added) (quoting *Ward's Equip.*, 254 Va. at 382). Therefore, the appellants' allegations concerning lack of privity in the amended complaint must be accorded their appropriate deference at the demurrer stage of the litigation.

As a result, without the contracts in question between the Authority and the parties in the record, the evidence before the circuit court reflected at most that a lessor-lessee relationship between VCU and the Authority existed, not that there was privity between the appellants and the contractors. Consequently, the circuit court's determination to that end was premature at the demurrer stage of the litigation. Therefore, we reverse the circuit court's decision to sustain the contractor's demurrers on the common law negligence claims.

C. *The circuit court erred in finding the judicial estoppel doctrine barred consideration of the appellants' UUDPA negligence per se claim.*[15]

The appellants further assign error to the circuit court's decision to apply the judicial estoppel doctrine to bar consideration of their UUDPA negligence per se claim on the grounds that

---

[15] Since we agree with the appellants that the circuit court erred for the reasons stated in assignment of error two, we decline to opine on the alleged alternative grounds for error in assignment of error three as we resolve this case "on the best and narrowest grounds available." *Harris v. Wash. & Lee Univ.*, 82 Va. App. 175, 205 n.15 (2024).

it relied on their factual allegations in the original complaint, which they altered in their amended complaint in a manner the circuit court found to be contradictory. In support, the appellants claim that by virtue of timely submitting an amended complaint, the original complaint was rendered a nullity that prevented its allegations from triggering the doctrine's application. We agree.

While "[t]he expression 'judicial estoppel' is relatively new in the lexicon of law[,] . . . the concept has ancient roots and 'derives from the prohibition in Scottish law against approbation and reprobation.'" *Wooten v. Bank of Am., N.A.*, 290 Va. 306, 309 (2015). "[J]udicial estoppel forbids parties from 'assum[ing] successive positions in the course of a suit, or series of suits, in reference to the same fact or state of facts, which are inconsistent with each other, or mutually contradictory." *Taylor v. Aids-Hilfe Koln, e.V.*, 301 Va. 352, 359 (2022) (alterations in original) (quoting *Lofton Ridge, LLC v. Norfolk S. Ry. Co.*, 268 Va. 377, 380-81 (2004)). "[I]f the inconsistent positions involve different proceedings, the parties to the proceedings *must be the same*, and the inconsistent position must have been relied upon by the court or prior court in rendering its decision." *D'Ambrosio v. Wolf*, 295 Va. 48, 58 (2018) (emphasis added) (quoting *Va. Elec. & Power Co. v. Norfolk S. Ry. Co.*, 278 Va. 444, 462 (2012)). Thus, it is "fundamental . . . that 'the party sought to be estopped must be seeking to adopt a position [of fact] that is inconsistent with a stance taken in a prior litigation." *Id.* (second alteration in original) (quoting *Bentley Funding*, 269 Va. at 326).

In terms of reliance on a pleading, a litigant's pleading is binding on them "*[u]nless amended.*" *Berry v. Klinger*, 225 Va. 201, 207 (1983) (emphasis added). The lack of reliance on an original complaint stems from the ancient rule that an amended complaint replaces the original, unless the face of the amended complaint clearly demonstrates a different intention.[16] *See Power v.*

---

[16] Before January 1, 2006, actions at law were commenced by filing a "motion for judgment" or a declaration. Rules 3:1; 3:2. Since then, all civil actions are commenced by filing a "complaint." *Id.* Though *Power v. Ivie*, 34 Va. (7 Leigh) 147 (1836), was a seriatim opinion of the Supreme Court of Virginia, its separate holdings found that upon amending, the original

- 18 -

*Ivie*, 34 Va. (7 Leigh) 147, 151-52 (1836) (seriatim opinion). So, when an amended complaint "is filed and a comparison of the original and amended pleading shows that the amended [complaint], was intended as a substitute for the original, the case stands as though the original had never been filed, *so far as it relates to the statement of facts*." *Breeding by Breeding v. Hensley*, 258 Va. 207, 212 (1999) (emphasis added) (quoting *Trotter v. E. I. Dupont De Nemours & Co.*, 124 Va. 680, 682-83 (1919)).

Here, since the appellants' original complaint was rendered a legal nullity by their filing of the amended complaint as ordered by the circuit court, the circuit court erred in finding such an amendment to trigger the judicial estoppel doctrine. As the Supreme Court of Virginia has opined, "[a]t the heart of judicial estoppel is the view that no litigant should be 'permitted to deny that which they have deliberately and solemnly asserted and received as true.'" *Wooten*, 290 Va. at 312 (quoting Simon Greenleaf, *A Treatise on the Law of Evidence* 27-28 (12th ed. 1866)). Where a trial court grants a litigant leave to amend their pleadings, the court expressly permits the denial that would otherwise be prohibited, allowing the litigant another opportunity to properly plead their case. *See, e.g.*, Code § 8.01-281(A)-(B) (allowing the practice pleading in the alternative); Code § 8.01-272 (allowing "[i]n any civil action, a party may plead as many matters, whether of law or fact, as he shall think necessary"); Rule 1:4(K) (allowing alternative pleading). Per this permission, the appellants made no contradictory assertion through their amended complaint. In fact, as the amended complaint did not refer to the original complaint, the appellants made *no assertions* to the circuit court as a matter of law through their replaced pleading. *Breeding*, 258 Va. at 212. Hence, the circuit court erred in finding that the judicial estoppel doctrine applied to the appellants'

---

declaration, the complaint of the time, the original was rendered a nullity. *See Power*, 34 Va. (7 Leigh) at 151 (Brockenbrough, J.); *id.* at 151-52 (Cabell, J.).

negligence per se claim. Therefore, we reverse its judgment and remand the negligence per se claims to the circuit court.

D. *The circuit court erred in sustaining the demurrer against the trespass to land claim.*

Lastly, the appellants contend that the circuit court erred in sustaining the demurrer to their common law trespass to land claim. In support, the appellants assign error to the circuit court's finding that the "Defendants were authorized to be working on the property at issue," claiming that determination was an improper factual determination for demurrer, and, as pleaded, the amended complaint showed that the contractors "lacked any right, authority or invitation to discharge water onto the property." We agree.

At the common law, "[a] trespass is an unauthorized entry onto property which results in interference with the property owner's possessory interest therein." *Cooper v. Horn*, 248 Va. 417, 423 (1994) (quoting 5 Richard R. Powell, *The Law of Real Property* 707 (Patrick J. Rohan ed., 1994)). "[A]n action for common law trespass to land derives from the 'general principle of law [that] every person is entitled to the exclusive and peaceful enjoyment of his own land, and to redress if such enjoyment shall be wrongfully interrupted by another.'" *Kurpiel v. Hicks*, 284 Va. 347, 353 (2012) (quoting *Tate v. Ogg*, 170 Va. 95, 99 (1938)). Moreover "[t]o recover for trespass to land, a plaintiff must prove an invasion that interfered with the right of exclusive possession of the land." *Collett v. Cordovana*, 290 Va. 139, 145 (2015) (quoting *Kurpiel*, 284 Va. at 353-54). "Any physical entry upon the surface of the land constitutes such an invasion, whether the entry is a walking upon it, *flooding it with water*, casting objects upon it, or otherwise." *Kurpiel*, 284 Va. at 354 (emphasis added) (quoting *Cooper*, 248 Va. at 423). And such trespass by flood can occur even if the water in question was not surface water.[17] *See, e.g.*, *Hampton Rds. Sanitation Dist. v.*

---

[17] Contrary to the circuit court and the contractors' contention, the common enemy does not apply to the government plaintiffs' theory of trespass to land as the doctrine applies to

- 20 -

*McDonnell*, 234 Va. 235, 240 (1987) (finding the discharge of sewage by a sanitation district to constitute such a trespass where evidence established that the defendant "designed, constructed, owned, operated, and controlled" the device that caused the flooding); *Akers v. Mathieson Alkali Works*, 151 Va. 1, 8, 17-18 (1928) (noting that a defendant manufacturer committed trespass by flood by permitting "muck and muck liquor" to escape a storage basin on its property); *see also Lee v. Evatt*, 114 Va. Cir. 253, 254, 262 (Fairfax 2024) (finding that trespass to land occurred when "water leaked from the [apartment] unit above [plaintiff's unit], owned by [defendant]").

Further, juxtaposing this requirement, "[i]t is axiomatic that a party cannot collect damages based on theories of waste or trespass when the party *consented* to the very actions alleged to constitute trespass or waste." *Vicars v. First Va. Bank-Mountain Empire*, 250 Va. 103, 109 (1995) (emphasis added). Such authorization or "[p]ermission" can occur through a contractual license which "has been described as a right, given by some competent authority[,] to do an act which without such authority would be *illegal, a tort, or a trespass*." *Horn v. Webb*, 302 Va. 70, 80 (2023) (second alteration in original) (emphasis added) (quoting *Bunn v. Offutt*, 216 Va. 681, 683 (1976)). Permission to be on the property by license is constrained by the terms of the license. *See Hardy v. McCullough*, 64 Va. (23 Gratt.) 251, 265 (1873). As such, "even if the entry of the defendants was [initially] lawful, if, after the entry, they, in their conduct, exceeded their authority, by doing some act which they had no right to do, the law will consider them as trespassers *ab initio*." *McClannan v. Chaplain*, 136 Va. 1, 11 (1923).

Here, as the contractors were in the Sanger Hall ventilation shaft to perform work pursuant to the Project contract for the Authority, we conclude that they had permission to be there subject to

---

surface water and "[s]urface water is defined as water diffused over the surface of the ground . . . until it reaches some well defined channel," and this definition of "surface water" does not encompass water contained within a pressurized water line. *Mullins v. Greer*, 226 Va. 587, 589 (1984) (quoting *Howlett v. City of S. Norfolk*, 193 Va. 564, 568 (1952)).

a contractual license. *Branner v. Kaplan*, 138 Va. 614, 619 (1924) (holding that under Virginia law a lessee has a right to "use the [leased] premises for any lawful purpose consistent with the character of the premises"). Specifically, the appellants' alleged trespass is that the water line rupture was "caused by the [contractors'] negligent design and construction" and "[t]he massive discharge of water onto the Commonwealth's land and the Sanger Hall building was without right, authority, or invitation." As the work in the ventilation shaft was pursuant to the Authority's status as a lessee and the record contains no evidence that the appellants objected to the contractors being in the *ventilation shaft*, these pleadings and the documents in the record show the contractors' presence in the shaft was authorized by contract.

But it is a different question altogether whether the water spilled as a result of the water line rupture exceeded the authority granted by that license. By itself, such flooding would constitute an "invasion" for purposes of a trespass action. *Kurpiel*, 284 Va. at 354. The appellants also contend that they never gave the contractors authority to discharge the water into Sanger Hall, and the contractors allege that such discharge stemmed from the contracted services, which the Authority specifically requested and the plaintiffs consented to when they approved the Project. *See Vicars*, 250 Va. at 109. As aforementioned, the contracts between the Authority and the contractors were not in the record before the circuit court. And this absence is critical here. With these allegations present, the circuit court could only sustain the demurer if it was clear from the records obtained through the motion craving oyer that the allegations "were contradicted by the terms" in the documents in the record. *Dodge*, 276 Va. at 5 (quoting *Ward's Equip.*, 254 Va. at 382). Without the contracts, we cannot make that determination.

Viewing the pleadings with the deference they are accorded, we conclude that if proven to be true, even with the putative contractual license provided by the lease, the contractors' authority to operate there would be exceeded when the water line ruptured and flooded Sanger Hall, rendering

the contractors "trespassers *ab initio*" as pleaded.  *McClannan*, 136 Va. at 11.  Thus, the circuit court's determination on demurrer that the contractors had permission to flood Sanger Hall subject to the Project agreement was a premature decision on a question of fact, inappropriate for the circuit court's determination on demurrer.  Therefore, we reverse the circuit court's judgment sustaining the demurrer against the common law trespass to land claims.

### III. CONCLUSION

In conclusion, we find that the circuit court erred by prematurely dismissing the common law negligence and trespass to land claims on demurrer, and further erred in applying the judicial estoppel doctrine to bar consideration of its UUDPA negligence per se claims.  A demurrer must not be used to "deprive[] a litigant of his day in court [or] deprive[] this Court of an opportunity to review a [more] thoroughly developed record on appeal," *Walsh*, 260 Va. at 176 (fourth alteration in original) (quoting *Seyfarth, Shaw, Fairweather & Geraldson*, 253 Va. at 95), and the circuit court's decision to sustain the demurrer on the appellants' negligence and trespass claims constituted such a "premature" dismissal due to the lack of pertinent contracts, *Assurance Data*, 286 Va. at 143 (quoting *Fun*, 245 Va. at 252).

We further hold that the circuit court erred in applying the judicial estoppel doctrine to bar the appellants' negligence per se claims as that doctrine is not triggered by differing factual allegations between an original and an amended complaint (where the amended complaint does not incorporate the original by reference) because the amended complaint in such a case serves as "substitute for the original," rendering the original a nullity as matter of law that does not constitute a factual assertion for purposes of the doctrine.  *Breeding*, 258 Va. at 212 (quoting *Trotter*, 124 Va. at 682-83).  Therefore, for the foregoing reasons, the circuit court's judgment is reversed and remanded for further proceedings consistent with this opinion.

*Reversed and remanded.*